Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 5387 | **DATE** | 11/30/01 |
| **CASE TITLE** | Fortney vs. Kuipers | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) X Status hearing[held/continued to] [set for/re-set for] on _____ set for 12/12/01 at 9:30.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Oder. The Court denies the attorneys motions for summary judgment (237,238,239,240,241,242,243,244,246,247,248,249,250,251, 252,253,264; denies Richard Naster's motion for summary judgment (233); and denies Wade and Kim Kuipers' motion for summary judgment (257). Court grants Dale Kuipers' motion for summary judgment (255) as to Counts 41 and 42 and as to the parts of Count 39 and 40 relating to the Lot 3 transfer. The plaintiffs' motion to strike (322 is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 03 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 329 |
| | Mail AO 450 form. | | *mw* docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 NOV 32 AM 11: 09 | | |
| | OR | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

LISA R. FORTNEY, et al.,  )
                          )
        **Plaintiffs,**  )
                          )
vs.                       )   Case No. 98 C 5387
                          )
DALE D. KUIPERS, et al.,  )
                          )
        **Defendants.**  )

**DOCKETED**
DEC 0 3 2001

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On a January night in 1991, Lisa Fortney, who was standing in or near the street after an accident, was hit by a tow truck owned by Dale and Bev Kuipers. She suffered serious and debilitating injuries; in fact, she lost her leg because of the accident. She sued Dale and Bev and their company in state court, where she received a sizable judgment -- around $650,000. The Kuipers' insurers paid the limits of their policy, but because the Kuipers were under-insured, that still left more than $500,000 of the judgment unsatisfied. On November 25, 1997, apparently before paying Fortney a dime out of their own pockets, the Kuipers filed for bankruptcy protection.

Fortney and the trustee of Dale and Bev's bankruptcy estate have sued to collect money and assets they allege Dale and Bev fraudulently transferred or hid to avoid having to pay on the judgment; they allege that Dale and Bev, along with their attorneys, their friends and their family, devised a plan to hide the assets and that all of these people helped to carry out that plan. Dale and Bev admit that they transferred and sold property as described in the complaint, though they deny that any of the transfers were made in furtherance of any conspiracy or scheme; they also

admit that they entered into these transactions on the advice of their attorneys, Jerry Boose and Raymond Agrella, who instructed them to liquidate their assets for cash. *See* Answer, ¶¶13, 15(a)-(t), (v)-(w). In addition to suing Dale and Bev, Fortney and the trustee have sued Jerry Boose and Raymond Agrella, their law firms and the individual partners of their law firms, Dale and Bev's son Wade and his wife Kim, Dale and Bev's son Dale (also known as Nick), Bev's mother Catherine Uthe (both individually and as trustee of the Uthe Family Trust Dated 4/27/93) and Dale's friend Richard Naster. The complaint in the adversary proceeding, which was transferred to this Court after we withdrew the reference to the Bankruptcy Court, names Dale and Bev, Nick, Wade and Kim, Uthe and the Uthe Family Trust, plus Dale and Bev's daughters Karla and Dawn, and another family trust and its trustees.

Before the Court are the parties' motions for summary judgment. The attorneys collectively filed sixteen separate motions, including one seeking summary judgment on a cross claim filed against them by Wade and Kim Kuipers. In addition, Dale and Bev's friend Richard Naster and Wade and Kim both filed their own motions for summary judgment in the civil action, and Nick Kuipers filed a motion seeking summary judgment on certain counts of the complaint filed in the adversary proceeding. The Court also has before it the plaintiffs' motion to strike the affidavit of Raymond Agrella filed in support of the attorney defendants' summary judgment reply brief.

The parties all included in their briefs the summary judgment standard, but briefly, "[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

2

Civ. P. 56(c). At this stage of the game, the Court views the facts and draws reasonable inferences in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and is precluded from making any credibility determinations. *Stewart v. RCA Corp.*, 790 F.2d 624, 628 (7th Cir. 1986).

A. The attorneys defendants' motions for summary judgment

The plaintiffs allege that Jerry Boose and Raymond Agrella violated the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. §§1962(a), (c) and (d), committed fraud and engaged in a civil conspiracy; they also allege that under the Uniform Partnership Act, their law firms and the other individual partners of those firms are liable for Boose's and Agrella's wrongful conduct. These defendants have moved for summary judgment on all claims alleged in the complaint; they are not named in the adversary proceeding. Before reaching the merits of the motions, the Court notes at the outset that it has no intention of discussing in this opinion every argument raised in each and every one of the sixteen separate motions filed by the attorneys; doing so would unnecessarily lengthen an already lengthy opinion. The attorneys' strategy, in filing sixteen separate motions including a catch-all asking for relief on any basis urged by any other party, seems to be to persuade the Court to parse out the allegations transaction by transaction to see whether each individual transaction is legal. The Court declines the invitation to look at the case that way. Given the nature of the claims alleged against the attorneys (RICO and conspiracy), the only sensible way to view the transactions is collectively. Accordingly, the Court will not discuss each nit picked by the attorneys but will focus on the heart of the arguments made in the various motions.

The plaintiffs allege that Boose and Agrella helped Dale and Bev transfer various pieces

3

of property and unload various assets in anticipation of an adverse judgment in the Fortney case and in anticipation of the bankruptcy filing that ultimately resulted from that judgment. From the evidence adduced to date, a jury reasonably could find that this was the case. On July 16, 1996, Boose wrote to Dale and Bev enclosing a fully executed copy of an assignment of interest in certain real property known as the Old Kirk Road property from a land trust held by Dale and Bev and Wade and Kim, to Wade and Kim individually. He wrote "[p]lease keep this in a safe place as you may want to change this ownership back after the trial is over." Boose testified that he meant they may need the property back from Wade and Kim to satisfy a judgment if it came to that, Deposition of Jerry Boose, p. 113, and of course a jury is free to accept that explanation. But the letter, combined with Dale and Bev's testimony concerning what Boose and Agrella told them to do (Bev testified that Boose told her and Dale to get rid of everything, that Agrella told them to liquidate their assets, and that they undertook all of the property transactions described in the complaint because their attorneys told them to, Deposition of Bev Kuipers, pp. 396, 400-01; Dale testified that Boose told them to "enjoy" their money or enjoy themselves during a conversation about liquidating their assets and that Agrella told them to liquidate their assets, Deposition of Dale D. Kuipers, pp. 278-79), would be enough to support a jury verdict in the plaintiffs' favor on these claims. We generally agree with the proposition -- asserted over and over again by the defendants -- that "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under §1962(c)." *United States v. Swan*, 224 F.3d 632, 635 (7th Cir. 2000). But according to Dale and Bev's testimony, the attorneys were doing more than just providing legal services; they were calling the shots and formulating the game plan. And that most certainly is

4

enough to subject them to RICO liability. *Id.* (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179, 183 (1993)). Moreover, if Agrella and Boose are on the hook, their partners are on the hook as well under the Illinois Uniform Partnership Act, 805 ILCS 205/13.[1]

We quickly address a few additional arguments raised by the attorneys in connection with the RICO counts. First, the attorneys argue that they are entitled to summary judgment on the §§1962(c) and (d) claims because Fortney cannot demonstrate either the existence of an "enterprise" or the connected "pattern of racketeering activity."

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. . . . The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. *United States v. Turkette*, 452 U.S. 576, 583 (1981), *quoted in United States v. Phillips*, 239 F.3d 829, 483 (7th Cir. 2001).

From the evidence presented thus far, a jury could find the existence of both an enterprise and a pattern of racketeering activity: the enterprise consisted of Dale and Bev, who held the property, the attorneys who managed and directed the transactions transferring or otherwise unloading the property, and the various friends and family members who took or helped to conceal the property or the proceeds from the sale of the property. As we explained above, there is evidence in the record from which a jury could conclude that Agrella and Boose were calling the shots, sitting at the head of the enterprise's hierarchy, while the others worked together to carry out their

---

[1]The individual partners in Agrella's and Boose's law firms have argued that they cannot be held vicariously liable under RICO. But the claims against them do not invoke RICO; Fortney and the trustee seek to hold the partners and the partnerships liable under the Uniform Partnership Act, not under RICO.

5

instructions – all for the single purpose of keeping Dale and Bev's assets from being used to satisfy the Fortney judgment. Moreover, there is evidence in the record from which a jury could conclude that the various property transfers and the acts of mail and wire fraud necessary to accomplish those transfers, all intended to further the enterprise's goal, constituted a pattern of racketeering activity. Accordingly, the Court denies the attorneys' motions for summary judgment on these bases.

The attorneys also argue that they cannot be liable under §1962(a). To hold the defendants liable under §1962(a), the plaintiffs must show that the defendants received income from a pattern of racketeering activity and used that income in the operation of an enterprise. *See Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 785 (7th Cir. 1999). The attorneys argue that the only compensation they received from any of the transactions at issue was legal fees, which were deposited into firm accounts and used solely to operate the attorneys' legitimate legal practices. But it is precisely those legal practices that are alleged to have furthered the pattern of racketeering: Boose and Agrella provided the legal services necessary to accomplish the various transactions complained of. Accordingly, the Court denies the motions for summary judgment on the §1962(a) claims.

Finally, the attorneys argue that they cannot be liable for any fraud or fraudulent transfers that occurred before November 1994, which is when, according to Dale's testimony, Agrella and Boose first advised him to liquidate his assets. But that is not the law; one who joins a conspiracy previously formed may be liable not only for acts done thereafter, but also for acts in furtherance of the conspiracy done before he joined. *E.g., United States v. Cerrito*, 413 F.2d 1270, 1272 (7th Cir. 1969); *National Organization for Women, Inc. v. Scheidler*, No. 86 C 7888,

1997 WL 610782, at *15 (N.D. Ill. Sept. 23, 1997) (citing *United States v. Walters*, 711 F. Supp. 1435, 1448 (N.D. Ill 1989)); *United States v. Lynch*, 699 F.2d 839, 842 n.2 (7th Cir. 1982)). Thus if the plaintiffs ultimately succeed in proving the existence of a conspiracy or a RICO conspiracy, even if we assume that the November date was the date the attorneys joined the conspiracy, the attorneys could be liable for acts done even before they joined the conspiracy. The Court denies the attorneys' motions for summary judgment on the claims alleged in the Fourth Amended Complaint. And in light of this ruling, the Court denies as moot the plaintiffs' motion to strike the affidavit of Raymond Agrella submitted in support of the attorneys' motions.

In addition to moving for summary judgment on complaint, the attorneys have moved for summary judgment on the cross claim filed against them by Wade and Kim Kuipers. In their cross claim Wade and Kim allege two counts of attorney malpractice and one count of fraud. The attorneys argue that they had no attorney client relationship with these defendants and therefore cannot be liable to them for malpractice. The Court finds that a trier of fact reasonably could conclude otherwise. Kim testified that Agrella's firm handled the initial purchase of the Old Kirk Road property, Deposition of Kim Kuipers, p. 94, and it is undisputed that Agrella and Boose's law firm handled the attempted failed transfers and the ultimate successful transfer of part of Dale and Bev's interest in the property to Wade and Kim. Kim also testified that some time in the summer or fall of 1995 she and Wade and Dale and Bev met with Dale and Bev's attorney, Agrella, to discuss concerns Kim and Wade had about their interest in the Old Kirk Road properties and the affect the Fortney lawsuit might have on that interest; she testified that Agrella essentially allayed their fears by telling them he did not think the property was at risk because of the lawsuit. *Id.*, pp. 101, 103-06. She also testified that even before the 1995

7

meeting, Joe Sauber, who worked with Agrella, had handled a number of matters for her and Wade and for West Suburban Concrete, Kim and Wade's business. *Id.*, pp. 94-97. Based on this evidence, a trier of fact could conclude either that an attorney-client relationship in fact existed between Kim and Wade and the law firm of which Sauber and Agrella were partners, which would provide a basis for a direct malpractice claim, or that in his capacity as Dale and Bev's attorney, Agrella performed legal services that primarily benefitted Wade and Kim,[2] which would provide a basis for the third-party beneficiary malpractice claim. *See Simon v. Wilson*, 291 Ill. App. 3d 495, 510-11, 684 N.E.2d 791, 802 (1997) (a nonclient may prevail in a negligence or malpractice action if he can show that he was a third-party beneficiary of the relationship between the attorney and the client, i.e., that the primary purpose and intent of the relationship was to benefit or influence the third party; third-party status is especially easy to establish when the scope of the attorney's representation involves non-adversarial matters). Accordingly, the Court denies the attorneys' motion for summary judgment on Counts 1 and 2 of Wade and Kim's cross claim.

B.  Richard Naster's motion for summary judgment

Richard Naster was (and may still be) a close friend of Dale Kuipers. At Dale's request, in August 1996, Naster purchased property known as Lot 4 of the Keystone Industrial Park from Nick Kuipers; Naster quit-claimed the property to Wade Kuipers in January 1997, apparently for

---

[2]Ultimately, of course, the point of the deal was to benefit Dale and Bev by keeping their property beyond Fortney's reach. And if the allegations of the complaint are true, any benefit to Wade and Kim may have been short-lived, if they were expected to return their interest to the trust or to Dale and Bev after the lawsuit. But a trier of fact reasonably could find that the purpose of the property transfer and the 1995 meeting, at least in the short term, was to benefit Wade and Kim by giving them a greater interest in the property.

8

no money. The plaintiffs allege two claims against Naster arising out of these transactions, violation of RICO §1962(d) and civil conspiracy (Counts 30 and 31). They allege that Naster agreed to buy Lot 4 from Nick and agreed later to give Lot 4 to Wade, knowing that the property was actually being held for Dale and Bev's benefit and knowing that transaction was set up to help Dale and Bev conceal their assets from Lisa Fortney. Naster has moved for summary judgment, arguing that there is no direct evidence that he knew about, or voluntarily participated in, the alleged conspiracy. The motion is denied. Although we agree with Naster that "there is no such thing as accidental, inadvertent or negligent participation in a conspiracy," it is also true that "[a] defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives, . . . is liable as a conspirator." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64, 645 N.E.2d 888, 894 (1995). And we think the evidence reasonably could support a finding that Naster falls into the latter camp, specifically that Naster knew Dale was trying to distribute his assets or minimize his investments so that Lisa Fortney could not get her hands on them.

The evidence suggests that the Lot 4 deal was, by any stretch, incredibly fishy, hardly an arm's-length transaction. There is evidence that before doing the deal, Naster knew about Fortney's lawsuit, knew it was weighing heavily on Dale's mind, and knew that Dale did not want his name formally associated with Lot 4. He also knew that Dale and Bev used the property in connection with their towing business and wanted to keep the property available for their use. Naster agreed to do the deal knowing that Dale was going to reimburse him for the downpayment out of Dale's cash reserves, knowing that Dale was going to make the mortgage payments, and knowing that he would make no money on the deal. Indeed Naster ultimately quit-claimed his

9

interest in the property to Wade Kuipers, who appears to have paid him nothing for the honor.

Naster signed the agreement to buy Lot 4 on July 7, 1996; the jury returned a verdict against Dale on July 26, 1996. It does not take much of a stretch to infer from the evidence that Dale saw the writing on the wall and took steps to protect his assets; nor would it require a great deal of imagination to infer from the evidence think that Dale may have confided some of the story to Naster, with whom he spent a lot of time and with whom he shared his personal history and private reflections, and that Naster signed on to help out his friend. Naster's arguments notwithstanding, the plaintiffs cannot be faulted for failing to come up with direct evidence of the conspiracy. "[C]onspiracy is rarely susceptible of direct proof; instead, it is established from circumstantial evidence and inferences drawn from evidence, coupled with commonsense knowledge of the behavior of persons in similar circumstances." *Id.* at 66, 645 N.E.2d at 895. A reasonable jury could find that Naster turned a blind eye to suspicious circumstances or that he knowingly participated in a fraud. Either would be enough to get the plaintiffs to a jury on their claims against Naster. This is so even if we accept that Naster lost money on the deal: a conspirator need not benefit from the wrongful action to be found liable. *Id.* at 65, 645 N.E.2d at 895 (citing *Halbertstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983)).

C. Wade and Kim Kuipers' Motion for Summary Judgment

Wade and Kim Kuipers are Dale and Bev's son and daughter-in-law. In addition to receiving an interest in the Lot 4 property from Naster, Wade and Kim also had a hand in transactions involving the Old Kirk Road property, which is actually two separate parcels of land that Wade and Kim and Dale and Bev held jointly. The plaintiffs have sued Wade and Kim alleging civil conspiracy (Counts 25 and 27) and violation of RICO §1962(d) (Counts 24 and

26). Wade and Kim have moved for summary judgment on both sets of counts.

The evidence shows that Dale and Bev and Wade and Kim jointly purchased the Old Kirk Road properties, with each couple initially holding a fifty percent interest in the land. The property was kept in a land trust (Land Trust 3306 at Firstar Bank). Wade and Kim did at least some maintenance and improvement on the properties. At some point, Wade and Kim became concerned about how the Fortney lawsuit would affect their interest in those properties. Specifically, Kim testified that they had originally intended to develop and sell the land and that she was concerned that the property would be tied up because of the litigation, and they would be unable to sell it; she also testified that she was concerned about the possibility that she and her husband could end up being co-owners on the property with Lisa Fortney or someone they did not know. Deposition of Kim Kuipers, pp. 103-04. In the summer or fall of 1995 Wade and Kim met with Dale and Bev and their attorney (Agrella) to discuss Wade and Kim's concerns. Ultimately, on June 5, 1996, an assignment was made out of the land trust giving Wade and Kim an eighty percent interest in the Old Kirk Road properties. *See* Firstar Assignment dated June 5, 1996 (part of Exhibit 124). Dale, Bev, Wade and Kim all maintain that the transfer was intended to ensure that the "sweat equity" Wade and Kim had put into the property would be protected.

There is evidence in the record from which a trier of fact reasonably could conclude that Dale and Bev transferred the Old Kirk Road properties to Wade and Kim to keep those assets out of Fortney's grasp: Robert Bina, who advised the Kuipers on certain real estate matters, testified that Bev told him she wanted to protect this property from Fortney's lawsuit and that she never mentioned anything about "sweat equity," Deposition of Robert Bina, pp. 29, 32-33, and Boose's July 16, 1996 letter suggests that the deal was set up so that Dale and Bev could get the property

11

back after the lawsuit was over. But the relevant question for purposes of this motion is whether there is evidence from which a reasonable jury could find that Wade and Kim knew that this was the intent behind the transfer. Although there is no evidence that Wade and Kim ever saw Boose's letter or that they knew about the conversations between Bina and Bev, there is evidence to suggest that Wade and Kim knew they were getting something of far greater value than they had given, and that the transaction was set up that way to keep the property (or at least a substantial portion of the property) temporarily off of Dale and Bev's asset list. First, a trier of fact easily could conclude that Wade and Kim had not done anywhere near enough work to warrant a transfer of an additional thirty percent interest in the property. Kim testified that the tenants on the properties performed their own yard work and were themselves responsible for general maintenance; she and Wade took care of "things of a larger nature." Deposition of Kim Kuipers, pp. 65-66. Along those lines, she testified that Wade leveled the gravel driveway on one of the properties, repaired sinks and light fixtures and put in a cement patio, billing the property for all supplies and expenses. *Id.*, pp. 67-68. In addition, Wade testified that he seal coated the driveway on the other property five or six times over the years, mowed the yards a couple of times a year, removed shrubs and trees as needed, did some minor roof repairs and tuckpointing, removed one fence and repaired another, performed drain tile, septic and sump pump repair, and did some remodeling in one of the units (he cleaned out the basement and garage, repaired the drywall, removed carpet and flooring, painted and put in new appliances). Deposition of Wade Kuipers, pp. 24-46. Based on this evidence a jury reasonably could conclude that there was no way Kim and Wade could have believed that their "sweat equity" was worth anywhere near $120,000 and $210,000 (depending on whose estimate of property values

12

one accepts). In addition, a jury reasonably could find that there is no way that Wade and Kim could have believed they were giving a reasonably equivalent value in exchange for the Lot 4 conveyance from Naster.

Moreover, Kim testified that the understanding among the four parties when they bought the properties was that they would split all expenses incurred and income derived from the property and that neither couple would bill for sweat equity. Deposition of Kim Kuipers, p. 73. Wade confirmed that the parties' understanding was that they would not charge for their sweat equity. Deposition of Wade Kuipers, p. 19. Wade testified that he and his father had a verbal agreement that, because he and Kim did more work on the property, they would receive a greater share of the profits than would Dale and Bev when they eventually sold the properties; Wade testified that they had never discussed or agreed on a specific break down or number. *Id.*, pp. 21-22. Based on this agreement, Wade and Kim's sweat equity did not entitle them to any additional interest in the property, yet without even raising the issue, they were given an additional thirty percent interest in the land and all its improvements. And, as we have said, it appears that they were simply handed title to the Lot 4 property without paying anything. Based on this evidence, a trier of fact could conclude that Wade and Kim knew that the value they gave for these properties was grossly inadequate to compensate the transferors for the property they received and that the transfers were being affected to keep the property away from Fortney. Accordingly, the Court denies Wade and Kim's motion for summary judgment on Counts 24 through 27.

D. <u>Dale N. ("Nick") Kuipers' motion for summary judgment (adversary complaint)</u>

Dale N. Kuipers, also known as Nick, is Dale's son and Bev's stepson; he has moved for

summary judgment on the four counts of the adversary complaint that are alleged against him individually. These counts involve the sale of real property known as Lot 3 and Lot 4 of the Keystone Industrial Park in Elburn, Illinois. In 1987, Dale and Bev bought Lot 3 and Lot 4 for $56,442.00 (the Court assumes this was the total combined purchase price, though the record does not make that clear). Nick contributed no money toward the purchase price of the property, but he contends that he and his parents had a verbal agreement that Nick would buy Lot 4 from his parents when he had the money to do so. In September 1994 Nick bought both Lot 3 and Lot 4 from Dale and Bev for a total of $145,400.52. In the complaint in the adversary proceeding, the Trustee of Dale and Bev's estate alleges that this transaction violated §§5(a)2(B) and 6(a) of the Illinois Uniform Fraudulent Transfer Act (Count 39 and 40) and §§548(a)(1)(B)(i)(ii)(I) and (III) of the Bankruptcy Code (Counts 41 and 42). The basis of all claims is that the purchase price was "grossly inadequate," in light of the fair market value of the properties (alleged in the adversary complaint to be $225,000.00), to compensate the estate for the property.

Nick has moved for summary judgment, arguing that the Trustee cannot win on these claims because Nick paid "reasonably equivalent value" for the property, which is what the IUFTA and the Bankruptcy Code require. In support of his motion, Nick submitted a certificate of appraisal, performed by John Almburg, a certified real estate appraiser, on April 18, 2001, which values the property (Lot 3 and Lot 4 combined) at $120,000 as of 1994. In response, the Trustee cites to the deposition testimony of Dale Kuipers (the elder) that the going rate for land at the time of the sale was $1.25 per square foot and that if Dale had charged Nick that rate, the purchase price would have far exceeded what Nick actually paid (somewhere in excess of $100,000). Deposition of Dale D. Kuipers, pp. 19, 24-28. Based on this evidence, a trier of fact

14

reasonably could conclude that Dale and Bev transferred Lot 4 to Nick without receiving reasonably equivalent value in exchange for the property. The Court therefore declines to enter summary judgment on any of the claims on this basis.

Nick also argues that he is entitled to summary judgment because the transfer of Lot 4 was in accordance with a verbal agreement between Dale and Nick, made at the time of the original purchase, that Dale and Bev were buying Lot 4 for Nick and that when he could he would reimburse them for the purchase price and any taxes or improvements, and they would transfer Lot 4 to him. *See* Deposition of Dale N. Kuipers, p. 15; Deposition of Dale D. Kuipers, p. 19. But as the Trustee points out, the purported good faith of the transacting parties is really immaterial in constructive fraud or fraud at law claims, which is what the Trustee has alleged; in such claims, the question is whether the transferor received reasonably equivalent value in exchange for the property transferred. *See In re Berland*, 215 B.R. 158, 171 (N.D. Ill. 1997); *Tcherepnin v. Franz*, 475 F. Supp. 92, 97 (N.D. Ill. 1979). Accordingly, the Court denies Nick's motion for summary judgment as to the Lot 4 transaction.

On the other hand, the Trustee has offered no evidence that Dale and Bev transferred Lot 3 for less than the fair market value of the property. Wade testified that he sold Nick the property for $1.25 per square foot, which he knew to be the going rate for property in the area at the time. Deposition of Dale D. Kuipers, p. 24. The Trustee has offered nothing to suggest that the purchase price for this lot was "grossly inadequate," and the Court therefore grants Nick's motion as to Lot 3.

Nick has also moved for summary judgment on Counts 41 and 42, which allege violations of §548(a)(1) of the Bankruptcy Code, arguing that that statute does not apply because

15

the transfers took place more than one year before Dale and Bev filed for bankruptcy protection. The Trustee did not respond to this argument. The Court agrees with Nick on this point. Section 548(a)(1) allows the trustee to avoid only those transfers made within one year of the date of the filing of the petition, 11 U.S.C. §548(a)(1), and in this case the Lot 3/Lot 4 transfers took place in September 1994 – more than three years before Dale and Bev filed their bankruptcy petition. Accordingly, the Court grants Nick's motion for summary judgment as to Counts 41 and 42.

## CONCLUSION

For the reasons explained above, the Court denies the attorneys' motions for summary judgment [Docket Items 237, 238, 239, 240, 241, 242, 243, 244, 246, 247, 248, 249, 250, 251, 252, 253 and 264]; denies Richard Naster's motion for summary judgment [Docket Item 233]; and denies Wade and Kim Kuipers' motion for summary judgment [Docket Item 257]. The Court grants Dale N. Kuipers' motion for summary judgment [Docket Item 255] as to Counts 41 and 42 and as to the parts of Counts 39 and 40 relating to the Lot 3 transfer, but otherwise denies the motion. The plaintiffs' motion to strike Raymond Agrella's affidavit [Docket Item 322] is denied as moot. The case is set for a status hearing on December 12, 2001 at 9:30 a.m.

Dated: November 30, 2001

MATTHEW F. KENNELLY
United States District Judge

16